**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x

AIRBNB, INC.,

                          Plaintiff,

              - against -

ERIC SCHNEIDERMAN, Attorney General of
the State of New York, in his official capacity;
CITY OF NEW YORK, a municipal corporation;
and BILL DE BLASIO, Mayor of the City of
New York, in his official capacity,

                        Defendants.

:    Case No.    16 cv 8239 (KBF)

---------------------------------------------------------------- x

## MEMORANDUM OF LAW IN SUPPORT OF APPLICATION OF AIRBNB, INC. FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

MYLAN L. DENERSTEIN
SARAH L. KUSHNER
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000

JOHN W. SPIEGEL
JONATHAN H. BLAVIN
ELLEN M. RICHMOND
JOSHUA PATASHNIK
Munger, Tolles & Olson LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
(415) 512-4000

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ....................................................................................................................4

I.      AIRBNB .....................................................................................................................4

II.     NEW YORK'S SCHEME FOR REGULATING SHORT-TERM RENTALS .................5

ARGUMENT .......................................................................................................................8

I.      STANDARD FOR TEMPORARY RESTRAINING ORDER .........................................8

II.     AIRBNB IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS .................8

      A.     Section 230 of the CDA Preempts the Act .........................................................8

            1.     Section 230 of the CDA Forecloses Attempts to Hold a Website
                 Liable for Allegedly Unlawful Content of Its Users...................................8

            2.     The Act Impermissibly Attempts to Hold Airbnb Liable for
                 Content Provided By Users.........................................................................11

                 (a)     Airbnb Is an "Interactive Computer Service" Provider ................11

                 (b)     Short-Term Rental Listings Are Information Provided by
                          Another Information Content Provider.........................................11

                 (c)     The Act Treats Hosting Platforms as "Publishers" or
                          "Speakers" of Third-Party Content ...............................................12

      B.     Enforcement of the Act Against Airbnb Violates the First Amendment...............15

            1.     The Act Imposes an Impermissible Content-Based Speech
                 Restriction .................................................................................................15

            2.     The Act Impermissibly Imposes Criminal and Civil Penalties on
                 Speech Without Any Scienter Requirement ...............................................18

            3.     The Act Is Unconstitutionally Vague .......................................................19

      C.     The Act Violates the Home Rule Clause of the New York State
           Constitution.....................................................................................................21

III.    AIRBNB FACES IRREPARABLE HARM UNLESS THE ACT IS ENJOINED..........23

IV.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR AIRBNB ..........25

CONCLUSION....................................................................................................................25

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*ACLU v. Clapper*,
    785 F.3d 787 (2d Cir. 2015).................................................................8

*AFA Dispensing Grp. B.V. v. Anheuser-Busch, Inc.*,
    740 F. Supp. 2d 465 (S.D.N.Y. 2010)..............................................8

*Alexander v. Cahill*,
    598 F.3d 79 (2d Cir. 2010)..........................................................17, 18

*Almeida v. Amazon.com, Inc.*,
    456 F.3d 1316 (11th Cir. 2006) ......................................................14

*Backpage.com, LLC v. Cooper*,
    939 F. Supp. 2d 805 (M.D. Tenn. 2013) .....................................13

*Backpage.com, LLC v. Hoffman*,
    2013 WL 4502097 (D.N.J. Aug. 30, 2013) .................................13

*Backpage.com, LLC v. McKenna*,
    881 F. Supp. 2d 1262 (W.D. Wash. 2012)..........................13, 14, 25

*Barnes v. Yahoo!, Inc.*,
    570 F.3d 1096 (9th Cir. 2009) ...............................................11, 12, 13

*Bartnicki v. Vopper*,
    532 U.S. 514 (2001)..........................................................................16

*Batzel v. Smith*,
    333 F.3d 1018 (9th Cir. 2003) ...............................................10, 24

*Bigelow v. Virginia*,
    421 U.S. 809 (1975)..........................................................................16

*Braun v. Soldier of Fortune Magazine, Inc.*,
    968 F.2d 1110 (11th Cir. 1992) ......................................................19

*Carafano v. Metrosplash.com, Inc.*,
    339 F.3d 1119 (9th Cir. 2003) ......................................................10

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
    447 U.S. 557 (1980)..........................................................................16

*Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay*,
    128 F. Supp. 3d 597 (E.D.N.Y. 2015) .........................................18

*Dart v. Craigslist, Inc.*,
    665 F. Supp. 2d 961 (N.D. Ill. 2009) ...................................................................11

*Edenfield v. Fane*,
    507 U.S. 761 (1993).............................................................................................18

*Entergy Nuclear Vermont Yankee, LLC v. Shumlin*,
    733 F.3d 393 (2d Cir. 2013)............................................................................3, 25

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
    521 F.3d 1157 (9th Cir. 2008) ......................................................9, 10, 11, 13

*Fields v. Twitter, Inc.*,
    2016 WL 4205687 (N.D. Cal. Aug. 10, 2016) ...............................................15

*Florida Bar v. Went For It, Inc.*,
    515 U.S. 618 (1995).............................................................................................16

*Forsyth County v. Nationalist Movement*,
    505 U.S. 123 (1992).............................................................................................16

*FTC v. LeadClick Media, LLC*,
    ___ F.3d ___, 2016 WL 5338081 (2d Cir. Sept. 23, 2016) ...............................9, 11

*Gibson v. Craigslist, Inc.*,
    2009 WL 1704355 (S.D.N.Y. 2009)...........................................................11, 14

*Hustler Magazine, Inc. v. Falwell*,
    485 U.S. 46 (1988)...............................................................................................19

*Inman v. Technicolor USA, Inc.*,
    2011 WL 5829024 (W.D. Pa. Nov. 18, 2011) ................................................11

*Jane Doe No. 1 v. Backpage.com, LLC*,
    817 F.3d 12 (1st Cir. 2016)........................................................10, 12, 15

*Johnson v. United States*,
    135 S. Ct. 2551 (2015).................................................................................20, 21

*Mazur v. eBay Inc.*,
    2008 WL 618988 (N.D. Cal. Mar. 4, 2008)..............................................11, 14

*Metro. Taxicab Bd. v. City of New York*,
    633 F. Supp. 2d 83 (S.D.N.Y. 2009)................................................................24

*Mitchell v. Cuomo*,
    748 F.2d 804 (2d Cir. 1984)..............................................................................25

*Morales v. Trans World Airlines, Inc.*,
   504 U.S. 374 (1992)..............................................................................................24

*N.Y. Progress & Prot. PAC v. Walsh*,
   733 F.3d 483 (2d Cir. 2013)..................................................................... passim

*New York State Bar Ass'n v. Reno*,
   999 F. Supp. 710 (N.D.N.Y. 1998).......................................................................24

*New York v. Ferber*,
   458 U.S. 747 (1982)..............................................................................................19

*News & Sun Sentinel Co. v. Bd. of Cty. Comm'rs*,
   693 F. Supp. 1066 (S.D. Fla. 1987)......................................................................18

*Recording Corp. v. Project Playlist, Inc.*,
   603 F. Supp. 2d 690 (S.D.N.Y. 2009)....................................................................9

*Reed v. Town of Gilbert*,
   135 S. Ct. 2218 (2015).........................................................................................16

*Reno v. ACLU*,
   521 U.S. 844 (1997)..............................................................................................20

*Rex Medical L.P. v. Angiotech Pharm. (US), Inc.*,
   754 F. Supp. 2d 616 (S.D.N.Y. 2010)..................................................................20

*Ricci v. Teamsters Union Local 456*,
   781 F.3d 25 (2d Cir. 2015).................................................................2, 9, 10, 13, 22

*Safelite Grp., Inc. v. Jepsen*,
   764 F.3d 258 (2d Cir. 2014)................................................................................17

*Satellite Television of N.Y. Assocs. v. Finneran*,
   579 F. Supp. 1546 (S.D.N.Y. 1984).....................................................................24

*Seldon v. Magedson*,
   2012 WL 4475274 (S.D.N.Y. July 10, 2012) ......................................................13

*Smith v. California*,
   361 U.S. 147 (1960)..............................................................................................19

*Smith v. Goguen*,
   415 U.S. 566 (1974)..............................................................................................21

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011)..........................................................................................2, 16

*Thompson v. W. States Med. Ctr.*,
    535 U.S. 357 (2002)................................................................................17

*Tom Doherty Assocs. v. Saban Entm't, Inc.*,
    60 F.3d 27 (2d Cir. 1995) ......................................................................25

*Toomer v. Witsell*,
    334 U.S. 385 (1948)................................................................................24

*United States v. X-Citement Video, Inc.*,
    513 U.S. 64 (1994)..................................................................................19

*Universal Commc'n Sys., Inc. v. Lycos, Inc.*,
    478 F.3d 413 (1st Cir. 2007) ..................................................................10

*Village of Schaumburg v. Citizens for a Better Env't*,
    444 U.S. 620 (1980)................................................................................16

*Zeran v. Am. Online, Inc.*,
    129 F.3d 327 (4th Cir. 1997) .....................................................9, 10, 14

STATE CASES

*City of New York v. 330 Continental, LLC*,
    60 A.D.3d 226 (2009) .............................................................................17

*City of New York v. Patrolmen's Benev. Ass'n*,
    89 N.Y.2d 380 (1996) .......................................................................22, 23

*City of New York v. Smart Apts. LLC*,
    39 Misc. 3d 221 (Sup. Ct. 2013)............................................................17

*City of New York v. State*,
    168 Misc. 2d 750 (Sup. Ct. 1995)..........................................................23

*Gentry v. eBay, Inc.*,
    99 Cal. App. 4th 816 (2002) ..................................................................10

*Greater N.Y. Taxi Ass'n v. State*,
    21 N.Y.3d 289 (2013)........................................................................22, 23

*Hill v. StubHub, Inc.*,
    219 N.C. App. 227 (2012) ...........................................................11, 12, 14

STATE CONSTITUTIONAL PROVISIONS

N.Y. Const., Article IX, § 2(b)(2)...................................................................3, 22

N.Y. Const., Article IX, § 3(d)(4)........................................................................22

**FEDERAL STATUTES**

47 U.S.C. § 230 ................................................................................................ passim

47 U.S.C. § 230(b)(1), (2), (4) ...................................................................................9

47 U.S.C. § 230(c)(1) ...................................................................................... passim

47 U.S.C. § 230(e)(3) ..................................................................................................1

47 U.S.C. § 230(f)(2) ...............................................................................................11

**STATE STATUTES AND MUNICIPAL ORDINANCES**

N.Y. Multiple Dwelling Law ("MDL") § 1 ............................................................20

MDL § 3 ......................................................................................................................5

MDL § 4 ......................................................................................................................5

MDL § 4(7) ................................................................................................................5

MDL § 4(8)(a) .....................................................................................................6, 18

MDL § 121 ...................................................................................................... passim

MDL § 121(1) ..................................................................................................6, 12, 15

MDL § 121(2) ................................................................................................... passim

MDL § 121(3) .....................................................................................................12, 20

MDL §§ 3-4 ................................................................................................................5

MDL § 304(1) ......................................................................................................7, 20

N.Y.C. Admin. Code § 27-232 ...................................................................................7

N.Y.C. Admin. Code § 27-287.1 ...................................................................... passim

N.Y.C. Admin. Code § 27-287.1(1)...................................................................6, 12, 15

N.Y.C. Admin. Code § 27-287.1(2)...........................................................7, 15, 20, 24

N.Y.C. Admin. Code § 27-287.1(3)...................................................................6, 12

N.Y.C. Admin. Code § 28-202.1 ...........................................................................7, 20

N.Y.C. Admin. Code § 28-203.1 ...........................................................................7, 20

N.Y.C. Admin. Code § 28-205.1 ............................................................................................7, 20

N.Y.C. Admin. Code § 28-206.1 ...............................................................................................20

N.Y.C. Admin. Code § 28-210.3 .................................................................................................5

**FEDERAL RULES**

Fed. R. Civ. P. 65.......................................................................................................................1

**FEDERAL LEGISLATIVE MATERIALS**

141 Cong. Rec. H8469-72 (1995)...........................................................................................24

## PRELIMINARY STATEMENT

Pursuant to Federal Rule of Civil Procedure 65, Plaintiff Airbnb, Inc. ("Airbnb") respectfully requests this Court issue a temporary restraining order to restrain Defendants Eric Schneiderman, the City of New York, and Bill de Blasio ("Defendants" or "the government"), and their respective officers, agents, servants, employees, and attorneys from taking any actions to enforce against Airbnb New York Multiple Dwelling Law ("MDL") § 121 and New York City Administrative Code § 27-287.1 (collectively, the "Act").[1]  This Act is clearly preempted by Section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230 ("Section 230"), and unless Defendants are enjoined from doing so, Airbnb faces the very real risk of being subject to significant civil penalties and criminal liability for the hosting of third-party listings in violation of the CDA.  The Act also violates the First and Fourteenth Amendments of the Constitution.

The Act amends both the MDL and Administrative Code to make it "unlawful to advertise occupancy or use" of accommodations that cannot lawfully be rented out for less than 30-day periods, and subjects violators to potential criminal prosecution and hefty civil fines.  App. A, §§ 1-2 (enacting MDL § 121 and N.Y.C. Admin. Code § 27-287.1).  The Act does not state whether websites and other intermediaries, such as platforms like Airbnb that host third-party listings, "advertise" within the meaning of the law and are subject to liability.  Given the ambiguity of the Act, Airbnb anticipates Defendants will argue that the Act applies to such online platforms, and will seek to enforce the Act against Airbnb and other such hosting platforms. Airbnb thus faces the real prospect of being the subject of an enforcement action under the Act. Such enforcement would be unlawful and should be enjoined.[2]

The Act violates—and therefore is clearly preempted by—Section 230 of the CDA, which prohibits "treat[ing]" websites that host or distribute third-party content, like Airbnb, "as the

---

[1] A copy of the Act is attached hereto as Appendix A.

[2] Airbnb does not concede that it is subject to liability under a correct interpretation of the Act, and expressly preserves the argument that it is not.  The arguments presented in this Memorandum explain why the Act would be unlawful *if* it were to be applied to Airbnb.

publisher or speaker of any information provided by another information content provider," immunizing them from liability under any "inconsistent" state or local law. 47 U.S.C. §§ 230(c)(1), (e)(3). As courts uniformly have recognized, these provisions bar the imposition of liability on websites premised on content provided by third parties. *See, e.g., Ricci v. Teamsters Union Local 456*, 781 F.3d 25, 26-28 (2d Cir. 2015). Even a sponsor of the Act acknowledged that "Airbnb is protected by the [CDA] and that gives them federal immunity for liability for content generated by third party users of the service, which is the host." Declaration of Jonathan H. Blavin ("Blavin Decl."), Ex. A at 5. Similarly, another proponent of the law testified that the CDA "protects online service providers" from "actions against them based on the content of third parties." *Id.*, Ex. B at 4. The Act violates this proscription by penalizing websites if they publish or fail to remove third-party listings for certain short-term rentals. Doing so inevitably treats Airbnb as the publisher of those listings, in violation of the plain text of the CDA.

The Act also contravenes the fundamental policy objectives of Congress in enacting Section 230. Congress sought to "promote the continued development of the Internet" as a vehicle for free expression and for a "vibrant and competitive free market." *Id.* §§ 230(b)(1)-(2). To that end, Congress opted to shield website operators from compulsory obligations to screen user content, and instead to provide them with the incentive to build innovative platforms and develop tools to address undesirable content without fear of legal retribution. *Id.* §§ 230(b)(3)-(4). Yet the Act seeks to punish online platforms for listings that are published on their sites, which flies in the face of the policy goals Congress sought to further when it passed the CDA.

The Act violates the First Amendment as well. By prohibiting the publication of certain rental advertisements, the Act imposes a content-based speech restriction subject to "heightened judicial scrutiny," *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011), and Defendants cannot meet their burden of demonstrating that this speech restriction directly advances a substantial state interest and does so in a narrowly tailored way. They cannot show that the obvious alternative of enforcing short-term rental laws against hosts who rent properties in violation of the law, rather than targeting advertisements, would be ineffective or inadequate. Just the opposite: it is clear

that Defendants *could* enforce short-term rental laws directly against non-compliant hosts—as they already do—rather than prohibit advertising.  Although the Act by its terms seeks to prohibit only unlawful ads, it inevitably would chill protected commercial speech.  The threat of liability likely would impose a form of self-censorship on both hosts and online platforms, due to the difficulty of distinguishing between hosts' lawful and unlawful ads.

The Act also violates the First Amendment and the Due Process Clause of the Fourteenth Amendment because it seeks to impose strict civil and criminal liability against alleged violators. Specifically, there is no requirement in the Act that an online platform or host *know* that the latter's advertisement is unlawful.  The Supreme Court has rejected such efforts to impose strict liability for the dissemination of information, even where the content itself lacks First Amendment protection.  *See Smith v. California*, 361 U.S. 147, 153-54 (1960).  In addition, the Act violates the First Amendment and the Due Process Clause because it is impermissibly vague, failing to provide a reasonable person with notice regarding whether its prohibitions apply to hosting platforms like Airbnb.  Finally, the Act violates the home rule clause of the New York State Constitution, N.Y. Const. art. IX, § 2(b)(2), because it relates to the local affairs of New York City, but was not enacted in accordance with the procedures required by the home rule clause.

Absent the intervention of this Court, the Act threatens irreparable harm to Airbnb in several ways.  First and foremost, Airbnb faces the threat of prosecution and significant penalties under a preempted law, which courts have recognized constitutes irreparable harm.  *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) ("irreparable injury" under preempted law where plaintiffs face "Hobson's choice" of "expos[ing] themselves to potentially huge liability" or "suffer[ing] the injury of obeying" law).  The imminent violations of Airbnb's constitutional rights also "'unquestionably constitute[] irreparable injury.'"  *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013).  Additionally, Airbnb faces the risk of substantial disruption to its business, and erosion of customer goodwill, if it is forced to remove thousands of listings from its site, including lawful ones, to comply with the law.

Given this palpable threat of irreparable harm, the equities tip sharply in Airbnb's favor.

Moreover, the public interest is served by enjoining the enforcement of a preempted state law, *Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, 733 F.3d 393, 422-23 (2d Cir. 2013), and preventing the violation of Airbnb's constitutional rights, *Walsh*, 733 F.3d at 488.  By contrast, an injunction would not prevent Defendants from enforcing short-term rental laws against hosts.

## BACKGROUND

### I.   **AIRBNB**

Airbnb provides an online platform through which persons desiring to book accommodations ("guests"), and persons listing accommodations available for rental ("hosts"), can locate and message each other and enter into direct agreements to reserve and book travel accommodations on a short- and long-term basis.  Declaration of David Owen ("Owen Decl.") ¶ 2.  Airbnb allows guests to make arrangements with hosts through online booking and enables the provision of payment processing services to permit hosts to receive payments electronically. *Id*. ¶ 3.  In consideration for use of its platform, Airbnb receives a service fee from both the guest and host, determined as a percentage of the accommodation fee set solely by the host.  *Id*.

Airbnb does not manage, operate, lease, or own hosts' accommodations, and it is not a party to the direct agreements between guests and hosts for the booking of accommodations offered by hosts.  *Id*. ¶¶ 4, 5.  Hosts, not Airbnb, decide whether to list their properties and with whom and when to transact, provide the descriptions of their rentals, and set their own lengths of stay and rental prices.  *Id*.  ¶ 6.  As Airbnb's Terms of Service state, hosts "alone are responsible for any and all Listings and Member Content [they] post."  *Id*., Ex. 1 at 6.

Airbnb advises its hosts and guests to be aware of and comply with local laws in listing and renting units.  The Airbnb Terms of Service note at their outset parties' "OBLIGATIONS TO COMPLY WITH APPLICABLE LAWS AND REGULATIONS," and that

> IN PARTICULAR, HOSTS SHOULD UNDERSTAND HOW THE LAWS
> WORK IN THEIR RESPECTIVE CITIES.  SOME CITIES HAVE LAWS THAT
> RESTRICT THEIR ABILITY TO HOST PAYING GUESTS FOR SHORT
> PERIODS. . . .  CERTAIN TYPES OF SHORT-TERM BOOKINGS MAY BE
> PROHIBITED ALTOGETHER.

*Id*., Ex. 1 at 1.  Similarly, the Airbnb "Responsible Hosting" page for New York City informs

hosts that "it's important for you to understand the laws in your city," provides links to the City's website describing applicable laws, and notes that the "State Multiple Dwelling Law restricts renting out a Class A multiple dwelling for periods of fewer than 30 days." *Id.*, Ex. 3 at 1.

As part of its Community Compact, Airbnb is committed to helping provide solutions tailored to the needs of cities like New York City with historic housing challenges. *See id.* ¶ 12. For example, Airbnb discretionarily removes listings that it believes may be offered by hosts with multiple "entire home" listings or by unwelcome commercial operators. *See id.* If Airbnb is alerted to shared spaces or private rooms that appear to be operated by unwelcome commercial operators or that do not reflect the community vision, it generally will remove such listings. *See id.* Within the last year, Airbnb has removed thousands of New York listings from its platform via its Community Compact efforts. *See id.* ¶ 13 & Ex. 4.

In New York, there are approximately 46,000 hosts on Airbnb. *Id.* ¶ 14. The typical New York host rents a unit for 36 nights a year on Airbnb, earning approximately $5,300 in income. *Id.* ¶ 14 & Ex. 5. Among Airbnb hosts in New York, 78% are low-, moderate-, or middle-income, and 72% of these hosts use the money they earn sharing their space to stay in their homes. *Id.*

## II.     NEW YORK'S SCHEME FOR REGULATING SHORT-TERM RENTALS

New York regulates short-term rentals at the state and city level. The MDL provides standards and requirements for multiple dwellings in cities of a certain size, and since 2010, the MDL has imposed certain restrictions on short-term rentals. *See* MDL §§ 3-4. The New York City Administrative Code imposes further restrictions on multiple dwellings, some of which affect short-term rentals. *See, e.g.*, N.Y.C. Admin. Code § 28-210.3 (making it unlawful to "offer or permit the use or occupancy or to convert for such use or occupancy [a] multiple dwelling … for other than permanent residence purposes").

Most relevant here, the MDL regulates the use and occupancy of multiple dwellings, which are dwellings "occupied as the residence or home of three or more families living independently of each other." MDL § 4(7). It states that a "'class A' multiple dwelling," such as "tenements, flat houses, maisonette apartments, apartment houses . . . and all other multiple

dwellings except class B multiple dwellings [such as hotels] . . . shall only be used for permanent residence purposes."  MDL § 4(8)(a).  "Permanent residence purposes," in turn, is "occupancy of a dwelling unit by the same natural person or family for thirty consecutive days or more."  *Id.* The MDL provides an exception to this rule, though, allowing rental of a multiple dwelling of less than 30 days for "[o]ther natural persons living within the household of the permanent occupant such as house guests or lawful boarders, roomers or lodgers."  *Id.* § 4(8)(a)(1)(A).

In other words, the MDL prohibits short-term rentals of less than 30 days unless (1) a building is occupied by less than three families (and is therefore not a multiple dwelling); (2) a building is occupied by three or more families but is nonetheless a "class B" dwelling, like a hotel or rooming house; or (3) the short-term rental occurs within the household of the permanent occupant (and therefore the short-term rental fits within the exception noted above).

In January 2016, the legislation that would become the Act was introduced in the Senate and Assembly.  Co-sponsored by State Senator Andrew Lanza and Assemblymember Linda Rosenthal, the Act alters the existing regulatory scheme by making it "unlawful to advertise occupancy or use of dwelling units in a class A multiple dwelling for occupancy that would violate" section 4(8) of the MDL.  MDL § 121(1); N.Y.C. Admin. Code § 27-287.1(1).  For purposes of the MDL, the term "advertise" is defined to mean:

> [A]ny form of communication for marketing that is used to encourage, persuade or manipulate viewers, readers or listeners into contracting for goods and/or services as may be viewed through various media including, but not limited to, newspapers, magazines, flyers, handbills, television commercials, radio, signage, direct mail, websites or text messages.

MDL § 121(2).[3]  Any "person"[4] found to have violated the Act "shall be liable for a civil penalty of not more than one thousand dollars for the first violation, five thousand dollars for the second

---

[3] Under the City Administrative Code, advertising is defined differently, as "any form of communication, promotion or solicitation, including but not limited to direct mail, newspapers, magazines, flyers, handbills, television commercials, radio, signage, direct mail, websites, text messages or similar displays, intended or used to induce, encourage or persuade the public to enter into a contract for goods and/or services."  *Id.* § 27-287.1(3).

[4] The Act does not define the term "person," nor does the MDL contain a generic definition of "person" applicable to all sections.  The City Administrative Code defines "person" as an "individual, partnership, corporation, or other legal entity."  N.Y.C. Admin. Code § 27-232.

violation and seven thousand five hundred dollars for the third and subsequent violations." *Id.*;

N.Y.C. Admin. Code § 27-287.1(2).

Both the MDL and the City Administrative Code also contain other penalty provisions. The latter provides that an "agent, architect, builder, contractor, engineer, or any other person who commits or assists in" a violation of the code shall be subject to civil penalties of up to $25,000. N.Y.C. Admin. Code §§ 28-205.1, 28-202.1.  If such a person or entity "commits or knowingly assists" in a violation, the government may also impose criminal penalties, such as a fine, imprisonment, or both.  *Id.* §§ 28-203.1; 28-206.1.  And the MDL provides that "every person"[5] who "shall violate or assist in the violation of any provision" of the MDL "shall be guilty of a misdemeanor punishable, for a first offense, by a fine of not exceeding five hundred dollars or by imprisonment for a period of not exceeding thirty days, or by both," and by increased penalties for subsequent offenses.  MDL § 304(1).

New York lawmakers have long acknowledged that the CDA limits their ability to regulate Airbnb.  For example, Assemblymember Rosenthal has noted that "Airbnb is protected by the [CDA] and that gives them federal immunity for liability … from content generated by third party-users of the service, which is the host."  Blavin Decl., Ex. A at 5.  That immunity, she explained, is why "[i]t is the host" alone who would be subject to liability under the Act, since "the host … is the person advertising."  *Id.*  Similarly, Senator Liz Krueger has testified before the Federal Trade Commission that the CDA "protects online service providers and users from actions against them based on the content of third parties," and that as a result, "companies like Airbnb and other online booking platforms oftentimes can act with near immunity from prosecution" with respect to publishing third-party listings.  *Id.*, Ex. B at 4; *see id.*, Ex. C at 2.

Despite this recognition that the CDA protects Airbnb, the Legislature nonetheless has suggested that the law is intended to restrict Airbnb's publication of advertisements.

---

[5]  Section 304(11) of the MDL defines the word "person," as used in section 304, to "include the owner, mortgagee or vendee in possession, assignee of rents, receiver, executor, trustee, lessee, agent or any other person, firm or corporation directly or indirectly in control of a dwelling or part thereof."  MDL § 304(11).

Assemblymember Rosenthal stated that the Act targets advertisements provided by "Airbnb-type operations." *Id.*, Ex. D at 2.  She also wrote that the Act recognizes that it is "[t]ime to play hardball with Airbnb" by "ban[ning] advertisements of illegal" short term rentals.  *Id.*, Ex. E at 1-2.  And at a hearing on the Act, a lawmaker asked whether the bill would apply to Airbnb; legislative counsel "stated that both the renter and the [hosting] service are advertising the units," implying that both might be subject to liability under the Act.  *Id.*, Ex. F at 1.

The New York State Senate and Assembly passed the Act on June 17, 2016.  The Governor signed it on October 21, 2016, and it went into effect immediately.  App. A, § 3.

## ARGUMENT

## I.     STANDARD FOR TEMPORARY RESTRAINING ORDER

"[T]he standard for an entry of a temporary restraining order is the same as for a preliminary injunction." *AFA Dispensing Grp. B.V. v. Anheuser-Busch, Inc.*, 740 F. Supp. 2d 465, 471 (S.D.N.Y. 2010).  Under that standard, a party must show that it "is likely to succeed on the merits," "is likely to suffer irreparable harm in the absence of preliminary relief," "that the balance of equities tips in [its] favor," and "that an injunction is in the public interest."  *ACLU v. Clapper*, 785 F.3d 787, 825 (2d Cir. 2015).  Alternatively, the party may show irreparable harm and either a likelihood of success on the merits or "'sufficiently serious questions going to the merits . . . and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'" *Id.*  "[I]n the First Amendment context . . . the likelihood of success on the merits is the dominant . . . factor." *Walsh*, 733 F.3d at 488.  Airbnb satisfies both standards.

## II.    AIRBNB IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS

### A.     Section 230 of the CDA Preempts the Act

#### 1.     Section 230 of the CDA Forecloses Attempts to Hold a Website Liable for Allegedly Unlawful Content of Its Users

The CDA unequivocally bars states and localities from imposing liability on websites premised on their role as a publisher of third-party content.  Because this is precisely what the Act would do as applied to Airbnb, its enforcement violates the CDA and is preempted.

8

The CDA provides:  "No provider or user of an interactive computer service," *i.e.*, an online platform, "shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  Section 230's express preemption provision bars liability "under any State or local law that is inconsistent with this section."  *Id.* § 230(e)(3).  "By its plain language, [Section] 230 creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user."  *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997).  A state, locality, or plaintiff may seek to hold "the original speaker" liable for allegedly unlawful content posted online, "but typically 'cannot sue the messenger,'" *i.e.*, the website itself.  *Ricci*, 781 F.3d at 28.

The Second Circuit has "recognized that Section 230 immunity is broad."  *FTC v. LeadClick Media, LLC*, ___ F.3d ___, 2016 WL 5338081, at *11 (2d Cir. Sept. 23, 2016) (citing *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1174 (9th Cir. 2008)); *see also id.* (citing approvingly an Eleventh Circuit case, in which that court observed that "[t]he majority of federal circuits have interpreted the CDA to establish broad federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service"); *Recording Corp. v. Project Playlist, Inc.,* 603 F. Supp. 2d 690, 699 (S.D.N.Y. 2009) (noting that the "CDA's grant of immunity should be construed broadly").  Thus, the Second Circuit has "join[ed]" the "consensus" among courts applying the CDA to "a growing list of internet-based service providers," including websites ranging from classified sites like Craigslist to social networking sites like Facebook.  *Ricci*, 781 F.3d at 26-28.  And a number of cases, including at least one in this District, have held that Section 230 immunizes online marketplaces like Airbnb from any liability stemming from the publication of third-party ads.[6]

---

[6] *See, e.g.*, *Gibson v. Craigslist, Inc.*, 2009 WL 1704355, at *3 (S.D.N.Y. 2009) (Craigslist immune under CDA for sale of gun on site); *see also Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961, 967 (N.D. Ill. 2009) (claim based on Craigslist adult section listings barred by CDA); *Mazur v. eBay Inc.*, 2008 WL 618988, at *9 (N.D. Cal. Mar. 4, 2008) (eBay immune from claim it failed to screen listings); *Hill v. StubHub, Inc.*, 219 N.C. App. 227, 247-48 (2012) (claim that StubHub hosting of event ticket sales violated law barred by CDA).

This "broad construction" of Section 230 "has resulted in a capacious conception of what it means to treat a website operator as the publisher or speaker of information provided by a third party." *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 19 (1st Cir. 2016).  This makes sense given the policy reasons behind the law.  In enacting Section 230, Congress declared it the "policy of the United States" to "promote the continued development of the Internet and other interactive computer services," "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services," and to "remove disincentives for the development and utilization of blocking and filtering technologies."  47 U.S.C. §§ 230(b)(1), (2), (4).  Congress recognized that the Internet would not flourish otherwise, "given the volume of material communicated through [the Internet]" and "the difficulty of separating lawful from unlawful speech."  *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 418-19 (1st Cir. 2007).  Thus, the CDA "sought to prevent lawsuits from shutting down websites and other services on the Internet," *Batzel v. Smith*, 333 F.3d 1018, 1028 (9th Cir. 2003), and "to maintain the robust nature of Internet communication and, accordingly, to keep government interference in the medium to a minimum,'" *Ricci*, 781 F.3d at 28.  Thus, "Congress, '[w]hether wisely or not, [ ] made the legislative judgment to effectively immunize providers of interactive computer services from civil liability in tort with respect to material disseminated by them but created by others.'"  *Recording Corp.,* 603 F. Supp. 2d at 699.

Congress also intended for the CDA to "encourage voluntary monitoring" and the creation of innovative platforms by immunizing websites from liability based on efforts to screen user content.  *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122-23 (9th Cir. 2003).  Thus, the CDA forbids actions against a site "for the exercise of its editorial and self-regulatory functions" about whether to block or allow content.  *Zeran*, 129 F.3d at 331.  "[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under Section 230."  *Roommates.com*, 521 F.3d at 1170-71.  The CDA also bars any action that would require a publisher of third-party content to alter the "construct and operation" of its website because a site's policies and practices are "as much an editorial decision

. . . as a decision not to delete a particular posting." *Lycos*, 478 F.3d at 422.

### 2.   The Act Impermissibly Attempts to Hold Airbnb Liable for Content Provided by Users

In applying the CDA, "courts have 'broken [it] down into three component parts,' finding that '[i]t shields conduct if the defendant (1) is a provider or user of an interactive computer service, (2) the claim is based on information provided by another information content provider and (3) the claim would treat [the defendant] as the publisher or speaker of that information.'" *LeadClick*, No. 15-1009-CV, 2016 WL 5338081, at *11 (citation omitted); *see also Gibson*, 2009 WL 1704355, at *3.   Each element is met here.

#### (a)   Airbnb is an "Interactive Computer Service" Provider

Airbnb easily satisfies the first element.   Unquestionably, hosting platforms like Airbnb are "interactive computer service" providers, as they provide information to "multiple users" by giving them "computer access . . . to a computer server."   47 U.S.C. § 230(f)(2).   "[T]he most common interactive computer services are websites."   *Roommates.com*, 521 F.3d at 1162 n.6.

#### (b)   Short-Term Rental Listings Are Information Provided by Another Information Content Provider

There is also no question that the third element is met because third parties create and provide the rental listings that appear on Airbnb's platform.   *See Jane Doe No. 1*, 817 F.3d at 19 (CDA applies where "contents of all of the relevant advertisements were provided" by third parties).   Section 230 encompasses "*any information* provided by another information content provider."   47 U.S.C. § 230(c)(1) (emphasis added).   Here, listings on hosting platforms are provided by "another information content provider"—third-party hosts.   Airbnb merely provides the forum for the listings.   Owen Decl. ¶¶ 6-7.   Third parties provide descriptions of their listings, set the lengths of any particular rental, and decide how many listings to place on Airbnb.   *See supra* at 4.   That websites like Airbnb may enable the processing of transactions, impose fees, and offer other services does not affect the CDA's applicability.   *See Jane Doe No. 1*, 817 F.3d at 16-17, 21; *Hill*, 219 N.C. App. at 245-46 (that StubHub "'controlled' the transaction by acting as an intermediary" and offered "certain guarantees and assumed responsibility for handling the

mechanics required to complete the transaction," irrelevant under CDA).

> **(c)     The Act Treats Hosting Platforms as "Publishers" or "Speakers" of Third-Party Content**

Under the third factor, courts look to "whether the duty" the law imposes "derives from the defendant's status or conduct as a 'publisher or speaker.'  If it does, section 230(c)(1) precludes liability."  *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101-02 (9th Cir. 2009).  Here, in at least three ways, the Act seeks to impose duties and exposes hosting platforms to liability based on their status as publishers of third-party content, in violation of the CDA.

*Liability for Publishing Listings and for Failing to Remove Listings.*  The Act makes it "unlawful to advertise occupancy or use of dwelling units" where that occupancy or use "would violate" the MDL.  MDL § 121(1); N.Y.C. Admin. Code § 27-287.1(1).  Under the Act, the term "advertise" includes "any form of communication for marketing that is used to encourage, persuade, or manipulate viewers, readers, or listeners into contracting for goods and/or services," including "websites."  MDL § 121(3); N.Y.C. Admin. Code § 27-287.1(3).  Yet, as noted above, Section 230 does not permit the government to punish websites for publishing third-party content. *See Ricci*, 781 F.3d at 28 (CDA "shields" defendants "from publisher liability" with respect to "web content provided by others").

Thus, courts have enjoined state laws that sought to impose liability on websites that published third-party ads allegedly concerning and promoting commercial sex acts.  The courts emphasized that these laws, which imposed requirements on sites to review and screen ads under threat of liability, violated Section 230 (and the First Amendment).  *See Backpage.com, LLC v. Hoffman*, 2013 WL 4502097, at *6 (D.N.J. Aug. 30, 2013) (statute "runs afoul of Section 230 by imposing liability" for "publishing" third-party ads); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 824 (M.D. Tenn. 2013) (enjoining state statute where "sale of online advertisements regulated by [law] derives" from site's "status" as "publisher"); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1273-74 (W.D. Wash. 2012) (same).  The Act is no different and thus also runs afoul of Section 230, since it imposes liability on sites for publishing allegedly unlawful ads.

Similarly, the Act impermissibly penalizes platforms for failing to remove content. This too targets Airbnb's acts as a publisher in violation of Section 230. Indeed, Congress enacted Section 230 to "protect websites against the evil of liability for failure to remove offensive content." *Roommates.com*, 521 F.3d at 1174; *see also Ricci*, 781 F.3d at 28 (CDA immunity applied where plaintiff "only" alleged that defendant "refused to remove" from its site "an allegedly defamatory newsletter that was authored by another"); *Recording Corp.,* 603 F. Supp. 2d at 701-02 (finding that defendant "is entitled to immunity under Section 230(c)(1)", since CDA preempts laws that impose liability "based on a website operator's passive acquiescence in the misconduct of its users," including where "users committed their misconduct using electronic tools of general applicability provided by the website operator" (citation omitted)).

The "decision whether to restrict or remove content falls squarely within a website operator's exercise of a publisher's traditional role and is therefore subject to the CDA's broad immunity." *Seldon v. Magedson*, 2012 WL 4475274, at *18 (S.D.N.Y. July 10, 2012). Moreover, it is irrelevant that a website knows or should know that third-party content is unlawful, since imposing liability for failure to remove such content still "necessarily involves treating the website as a publisher of the content it failed to remove." *Barnes*, 570 F.3d at 1102-03; *see also Zeran*, 129 F.3d at 333 (notice-based liability would destroy "the vigor of Internet speech and . . . service provider self-regulation"). Thus, by imposing liability on Airbnb based on its failure to remove ads of allegedly unlawful short-term rental, the Act plainly violates the CDA.

***Requiring Websites to Pre-Screen Content.*** Moreover, to avoid liability, the Act necessarily requires online platforms to pre-screen third-party content, which is also precluded under the CDA. Specifically, under the CDA, a party cannot be held "liable for its alleged failure to block, screen, or otherwise prevent the dissemination of a third party's content, *i.e.,* the [] advertisement in question." *Gibson*, 2009 WL 1704355, at *4. That is because "screening" a listing "is akin to deciding whether to publish," so a website "is immune under [S]ection 230 for its screening decisions." *Mazur*, 2008 WL 618988, at *9; *see also Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 n.3 (11th Cir. 2006) (CDA "clearly inconsistent with state law that makes"

13

sites "liable based on their efforts to screen").

As the *McKenna* court held, "by imposing liability on online service providers who do not pre-screen content or who 'know' that third party content may violate state law, the statute drastically shifts the unique balance that Congress created with respect to the liability of online service providers that host third party content." 881 F. Supp. 2d at 1274.  For example, in *Gibson*, a plaintiff sued Craigslist after he was shot with a handgun that the shooter purchased via a third-party advertisement posted on the Craigslist platform.  2009 WL 1704355, at *1.  His claims were based on Craigslist's failure to screen or block that advertisement.  *Id.*  The court held that the CDA barred his claims because they "[were] directed toward Craigslist as a 'publisher' of third party content and 'Section 230 specifically proscribes liability in such circumstances.'"  *Id.* at *4.  The same is true here, and accordingly, the CDA preempts the Act.

***Dictating Construct and Operation of Websites.***  Finally, the Act directly regulates Airbnb's decisions regarding the structure and operation of its website.  To ensure that they do not run afoul of the Act, platforms will be forced to verify that third-party rental listings on their sites comply with the Act before posting them.  This likely would require, at a minimum, verifying whether a unit is in a Class A multiple dwelling building and whether the host is a permanent resident of the unit during the time of the rental (rendering it permissible under the MDL).  But the CDA precludes the government from holding website operators liable for third-party content where, in order to avoid liability, the operator would have to alter the format, structure, or operation of its site with respect to third-party content.

For example, in *Jane Doe No. 1*, the plaintiffs challenged "choices" that the defendant "made about the posting standards for advertisements" that were allegedly "designed to encourage sex trafficking," such as the lack of "phone number verification" for numbers in ads, the "option to anonymize e-mail addresses," and the site's "acceptance of anonymous payments."  817 F.3d at 16, 20-21.  The First Circuit rejected the argument that such conduct was "distinguishable from publisher functions," holding that the CDA "extends to the formulation of precisely the[se] sort of website policies and practices."  *Id.* at 20.  Such features reflect "choices about what content can

14

appear on the website and in what form," and "decisions in structuring [] website and posting requirements are publisher functions entitled to section 230(c)(1) protection." *Id.* at 21-22; *see also Fields v. Twitter, Inc.*, 2016 WL 4205687, at *7 (N.D. Cal. Aug. 10, 2016) (similar). Likewise here, by requiring Airbnb to build screening and verification procedures into its platform, the Act impermissibly dictates the construction and operation of Airbnb's website.

### B.   Enforcement of the Act Against Airbnb Violates the First Amendment

#### 1.   The Act Imposes an Impermissible Content-Based Speech Restriction

Airbnb is likely to establish that the Act violates the First Amendment.  The Act seeks to proscribe and punish speech, in the form of host advertisements, based on the content of that speech:  whether the ads promote occupancy of a dwelling unit that would violate certain provisions of the MDL.  Defendants cannot justify that restriction under the First Amendment.

The Act clearly seeks to punish speech:  It directly prohibits "advertis[ing] occupancy or use of dwelling units" under certain circumstances and imposes penalties for failure to comply. *See* MDL § 121(1)-(2); N.Y.C. Admin. Code § 27-287.1(1)-(2).  Publishing listings advertising products or services constitutes protected commercial speech.  *See, e.g.*, *Bigelow v. Virginia*, 421 U.S. 809, 818 (1975).  The Act also regulates speech in a content-based manner, because the government "'must necessarily examine the content of the message that is conveyed'"—*i.e.*, the listings on Airbnb's site—to enforce the Act.  *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134 (1992); *accord Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226-27 (2015).

"In the ordinary case, it is all but dispositive to conclude that a law is content-based." *Sorrell*, 564 U.S. at 571.  Such laws are "presumptively unconstitutional," *Reed*, 135 S. Ct. at 2226, even when they pertain to commercial speech.  "Under a commercial speech inquiry, it is the State's burden to justify its content-based law as consistent with the First Amendment." *Sorrell*, 564 U.S. at 571-72.  The government must show "the statute directly advances a substantial government interest" and there is a "'fit between the legislature's ends and the means chosen to accomplish those ends.'"  *Id.* at 572; *see also Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 632 (1995) (law must be "'narrowly tailored to achieve the desired objective'"); *Cent.*

*Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 564-66 (1980).

Defendants cannot demonstrate that the Act directly advances or is narrowly tailored to any substantial or compelling government interest.  Even assuming criminalizing unlawful short-term rentals constitutes such an interest (which is far from clear), Defendants cannot show that a *restriction on speech* is necessary to achieve the interest.  "The normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it," not to punish those who engage in speech regarding the conduct.  *Bartnicki v. Vopper*, 532 U.S. 514, 529 (2001); *see also Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 637 (1980) (invalidating speech restriction where conduct "can be prohibited and the penal laws used to punish such conduct directly").  Rather than operating "directly," as the First Amendment requires, *Sorrell*, 564 U.S. at 572, the Act by its own terms operates *indirectly*: it targets advertisements for an activity rather than the illegal activity itself.

That principle is especially relevant here, where the government could directly punish individuals who actually provide unlawful rentals, rather than individuals and hosting platforms who merely advertise such rentals and publish advertisements.  For example, in 2014, New York City conducted 883 inspections and issued 495 Environmental Control Board Violations and 391 Department of Buildings Notices of Violation.  *See* Blavin Decl., Ex. G at 2.  Moreover, both New York City and the State have undertaken major enforcement actions against serial violators. *See, e.g.*, *City of New York v. Smart Apts. LLC*, 39 Misc. 3d 221, 224, 227, 233 (Sup. Ct. 2013) (affirming injunction against defendant who rented short-term stays in "as many as 50" class A multiple dwellings; City was able to put forward an "overwhelming avalanche of evidence"); *City of New York v. 330 Continental, LLC*, 60 A.D.3d 226, 230 (2009) (enforcement action against operator of "apartment hotels").  Indeed, in March 2016, Assemblymembers Rosenthal and Jumaane Williams noted that the City "recently allocated several million dollars to fund," among other things, "[i]nspectors from multiple City Agencies to identify and fine apartment owners and tenants who post illegal listings."  Blavin Decl., Ex. H at 1.  The City also plans to pass a law that will "allow the City to more accurately track and fine repeat offenders."  *Id.*

16

Defendants cannot show that this alternative of enforcing existing law against those who violate it is insufficient.  This dooms the Act under the First Amendment.  *See, e.g.*, *Safelite Grp., Inc. v. Jepsen*, 764 F.3d 258, 265 (2d Cir. 2014) (enjoining law where "[p]re-existing law provides a thoroughly effective way of protecting" state interest); *Alexander v. Cahill*, 598 F.3d 79, 96 (2d Cir. 2010) (enjoining law where "other regulations short of content-based bans" had been proposed and "[n]othing in the record suggests" they would have been "ineffective").

Moreover, even if the Act *would* more efficiently prevent unlawful rentals and help the government enforce its short-term rental laws, this would be insufficient.  The First Amendment precludes the government from restricting advertising and speech simply because it may be more politically or administratively convenient.  *See Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002) (speech restrictions must be "a necessary as opposed to merely convenient means of achieving [the government's] interests").  The government seeks to place the burden of verifying hosts' compliance with the law on hosting platforms—a substantial burden, given the effort needed to verify each of thousands of New York rental listings, and the onerous burdens placed on hosts, and one which could result in the suppression of vast amounts of protected speech.  Owen Decl. ¶¶ 15-20.  The government may not seek to "shift[] the burden of enforcing the law from the taxpayer" to speakers or publishers of information simply because it is easier to do so.  *News & Sun Sentinel Co. v. Bd. of Cty. Comm'rs*, 693 F. Supp. 1066, 1072-73 (S.D. Fla. 1987).

Defendants cannot assert that First Amendment protection does not apply based on the *potential* that some listings may "advertise" rental of a Class A multiple dwelling that would violate the MDL.  That is because it generally is not possible to tell, from the face of a listing, whether the listing is for an unlawful rental.  For instance, the Act bans only advertisements relating to certain "Class A" multiple dwellings, but only some types of buildings qualify as "Class A" multiple dwellings subject to the law—i.e., those dwellings that are occupied by three or more families, and which include buildings such as "tenements, flat houses, … garden-type maisonette dwelling projects," and various kinds of apartments.  MDL § 4(8)(a).  Likewise, certain occupancies for fewer than 30 days are expressly permitted, including occupancy by

17

"house guests or lawful boarders, roomers, or lodgers" when the permanent resident also occupies the dwelling. *Id.* § 4(8)(a)(1)(A). The content of a listing often does not reveal whether the building at issue is covered by section 4(8), or whether the occupancy falls within a lawful exception, such as when the host is a permanent resident of the unit. In order to ensure compliance with the law, therefore, Airbnb will be forced to remove even *lawful* listings from its platform. Owen Decl. ¶¶ 17, 19. It will be similarly difficult (or impossible) for hosts posting advertisements for short-term rentals to determine whether their advertisements violate the Act.

In these circumstances—where a restriction on commercial speech will impair both protected and potentially unprotected speech—courts apply First Amendment scrutiny. *See, e.g.*, *Edenfield v. Fane*, 507 U.S. 761, 768-69 (1993) (if protected speech "will be snared along with [unprotected] commercial speech, the state must satisfy the remainder of the *Central Hudson* test"); *Alexander*, 598 F.3d at 89 (First Amendment scrutiny required where government regulation will affect speech that is "only *potentially*" unlawful); *Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay*, 128 F. Supp. 3d 597, 615 (E.D.N.Y. 2015) (where "the legality of a proposed commercial transaction depends on circumstances outside the content of the speech, … the speech is entitled to protection under *Central Hudson*"). Although the Act may seek to prohibit only unlawful ads, it inevitably would "chill protected commercial speech" because "the fear of liability" would "impermissibly impose a form of self-censorship" on platforms like Airbnb that cannot distinguish between lawful and unlawful ads. *Braun v. Soldier of Fortune Magazine, Inc.*, 968 F.2d 1110, 1116-17 (11th Cir. 1992) (First Amendment scrutiny is required unless the advertisement in question is unlawful "on its face" without the need for further investigation). The Act must pass muster under the First Amendment.

### 2.   The Act Impermissibly Imposes Criminal and Civil Penalties on Speech Without Any Scienter Requirement

The Act also must be invalidated because it imposes penalties on platforms and hosts who violate it, without requiring a showing that they *knew* the listing at issue is unlawful under the Act. The First Amendment and the Due Process Clause do not permit this approach.

The Supreme Court has long rejected the imposition of strict criminal liability for engaging in speech, even where the content itself lacks First Amendment protection.  In *Smith v. California*, 361 U.S. 147 (1960), the Supreme Court struck down a Los Angeles ordinance making it a crime for booksellers to possess obscene books, noting the law would require booksellers to review every book or face strict criminal liability, which "would tend to restrict the public's access to forms of the printed word which the State could not constitutionally suppress directly."  *Id.* at 153-54; *see also New York v. Ferber*, 458 U.S. 747, 765 (1982) ("[C]riminal responsibility may not be imposed without some element of scienter on the part of the defendant."); *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78 (1994).  The Court has made clear that similar principles apply in the civil context.  *See, e.g.*, *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 52 (1988) ("A rule that would impose strict liability on a publisher for [unprotected speech] would have an undoubted 'chilling' effect.").

The Act violates these well-established principles.  It imposes severe criminal and civil penalties on individuals and publishers without any *mens rea* requirement.  *See* MDL § 121(2); N.Y. Admin. Code § 27-287.1(2) (providing for civil penalties for violations of the Act); N.Y.C. Admin. Code §§ 28-202.1, 28-205.1, 28-203.1, 28-206.1 (providing for criminal penalties for knowing violations); MDL § 304 (providing for criminal penalties for any "violation of any provision of this chapter"; MDL § 1 (entire MDL constitutes the "chapter").[7]  Yet neither the Act nor any other MDL provision sets forth any scienter or *mens rea* requirement—it creates a strict liability crime for advertising unlawful rentals.  Rather than risk prosecution under such a broad statute, hosting platforms and hosts may well opt simply not to post *any* listings.

### 3.   The Act Is Unconstitutionally Vague

One additional feature of the Act underscores why it is unconstitutional:  The statute is impermissibly vague as to whether it applies to hosting platforms at all.  This vagueness implicates both the First Amendment and the Due Process Clause.  *See Reno v. ACLU*, 521 U.S.

[7] Airbnb does not concede that it would in fact be subject to criminal liability under a correct interpretation of the Act, and expressly preserves the argument that it would not be.

19

844, 871-72 (1997) (vagueness presents First Amendment concerns because of "chilling effect" on speech); *Johnson v. United States*, 135 S. Ct. 2551, 2556-57 (2015) (due process).

The Act makes it "unlawful to advertise occupancy or use of dwelling units" where that occupancy or use "would violate" the MDL.  MDL § 121(1); NYC Admin. Code § 27-287.1(1). The Act specifies that the meaning of the term "advertise" encompasses "any form of communication for marketing that is used to encourage, persuade, or manipulate viewers, readers, or listeners into contracting for goods and/or services," and also specifies that "any person found to have violated" the operative prohibition of the Act is "liable for a civil penalty" (MDL § 121(2)-(3))—and thus also may be criminally liable.  *See* N.Y.C. Admin. Code §§ 28-203.1; 28-206.1; MDL § 304(1).  But the Act does not specify whether that prohibition applies only to hosts, or to hosting platforms and other advertising media as well.

In addition to the unclear text, the legislative history regarding the Act also is contradictory on the question of whether the law extends to hosting platforms.  *See supra* at 7-8. Assemblymember Rosenthal stated at a hearing on the Act that "[i]t is the host" alone who would be subject to liability under the law, since "the host … is the person advertising," and "Airbnb is protected by the Communications Decency Act."  Blavin Decl., Ex. A at 5.  At the same time, other legislative history points in the opposite direction:  in response to a question from a lawmaker, legislative counsel "stated that both the renter and the [hosting] service are advertising the units," *id.*, Ex. F at 1, and Assemblymember Rosenthal has stated that her goal in sponsoring the Act was to "play hardball with Airbnb," *id.*, Ex. E at 1.

Under the First Amendment and Due Process Clause, this lack of clarity in the statutory text and legislative history forecloses the enforcement of the Act against Airbnb.  Any law providing for criminal liability must "give ordinary people fair notice of the conduct it punishes." *Johnson*, 135 S. Ct. at 2556.  And where a statute imposing penalties targets speech or expressive conduct, the void-for-vagueness doctrine "demands a greater degree of specificity than in other contexts."  *Smith v. Goguen*, 415 U.S. 566, 573 (1974).

Under this doctrine, courts routinely have invalidated state laws impinging on First

Amendment rights without clearly specifying whether they apply to certain conduct.  For example, in *Hayes v. Attorney Grievance Committee*—a case, like this one, concerning advertising—the Second Circuit held impermissibly vague a New York attorney-conduct rule requiring lawyers seeking to advertise themselves as specialists to "prominently ma[k]e" a certain state-prescribed disclosure.  672 F.3d 158, 161 (2d Cir. 2012).  The court reasoned that this requirement "would clearly chill legitimate advertising by similarly situated lawyers" because "a lawyer of ordinary skill and intelligence could not reasonably discern" what conduct the statute prohibited.  *Id.* at 170.  The court emphasized that its "concern [was] only exacerbated by the inability" of the Attorney Grievance Committee "to clarify the content of the rule," given the conflicting statements by the committee's counsel as to what type of advertising the rule prohibited.  *Id.*  So too here: the Act's prohibition on "advertising" fails to give adequate notice whether it applies to hosting platforms, and the conflicting statements made by the legislative sponsors and counsel regarding the reach of the Act confirm its impermissible vagueness.

### C.   The Act Violates the Home Rule Clause of the New York State Constitution

The Act also is invalid on the ground that it violates the home rule clause of the New York State Constitution.  Under this clause, as relevant here, the Legislature may "act in relation to the property, affairs or government of any local government only by general law, or by special law only . . . on request of two-thirds of the total membership of its legislative body or on request of its chief executive officer concurred in by a majority of such membership."  N.Y. Const., art. IX, § 2(b)(2).  "Thus, a special law which relates to the property, affairs or government of New York City violates this constitutional provision unless enacted upon a home rule message from the City."  *City of New York v. Patrolmen's Benev. Ass'n*, 89 N.Y.2d 380, 387-88 (1996).

There is no question that the Act is a "special law" insofar as it affects New York City. *See id.* at 388; N.Y. Const., art. IX, § 3(d)(4) (defining "special law").  The Act amends Title 27 of the New York City Administrative Code, and does so in a manner that differs substantively from the amendments made by the Act to state law.  *See supra* at 6 & n.3.  Moreover, the legislative history of the Act confirms that it sought to target short-term rentals in New York City

in particular—noting, for instance, that the original genesis of changes in short-term rental laws was "an explosion of illegal hotel operators in single room occupancy buildings *in New York City*." Blavin Decl., Ex. I at 3 (emphasis added). Yet despite being a "special law" in this respect, the Act did not comply with the home rule procedure laid out by the New York Constitution: The City never sent any home rule message to the Legislature. *See Patrolmen's Benev.*, 89 N.Y.2d at 388. The Act thus presumptively violates the home rule clause.

New York courts have read into the home rule clause an "exception … where the State possesses a 'substantial interest' in the subject matter and 'the enactment bears a reasonable relationship to the legitimate, accompanying substantial state concern." *Greater N.Y. Taxi Ass'n v. State*, 21 N.Y.3d 289, 301 (2013). But this exception does not apply here, for several reasons. First, the Act does not on its face specify what the substantial state interest is, so this Court must "turn to [the Act's] legislative history," *Patrolmen's Benev.*, 89 N.Y.2d at 392, and as noted above, the legislative history reveals that the primary motivating force behind the Act is *local* concerns in New York City, not a *statewide* interest. Indeed, as to nonresidents of the City who live within the State, the Act's restrictions will serve to make it *more* difficult to find affordable housing options when visiting the City. Unlike state laws that regulate aspects of the City that make it easier for state residents to visit the City, this law has the opposite effect, ultimately hurting out-of-City state residents. *Cf. Greater N.Y. Taxi Ass'n*, 21 N.Y.3d at 302-03 (state law increasing number of handicap-accessible taxis in City addressed matter of substantial state concern because "[m]illions of people from within and without the State visit the City annually" and such visitors "will undoubtedly benefit from the increase in accessible vehicles in" the City).

Second, because existing law already provides for enforcement of short-term rental laws directly against non-compliant hosts, the government has not shown that any marginal impact of the Act's *restriction on advertising* bears a relationship to any substantial state interest. *Cf. City of New York v. State*, 168 Misc. 2d 750, 757 (Sup. Ct. 1995) (finding no substantial state interest in legislation that would have saved the State $2 million annually out of a $1.115 billion state judicial system budget). And third, the Act's stated goal of "protect[ing] communities and

existing affordable housing stock" (Blavin Decl., Ex. I at 3) is belied by the fact that its restrictions will make it more difficult for residents to use home-sharing to help pay their rent or mortgage, rendering already expensive municipal areas even less affordable.  Owen Decl. ¶ 14 & Ex. 5; *see Patrolmen's Benev.*, 89 N.Y.2d at 387-94 (no relationship to substantial state interest where "act does not and cannot accomplish the most clearly expressed legislative objective"). Similarly, the substantial penalties applicable under the Act will inflict significant economic hardship on City residents who rely on home-sharing to make ends meet, in conflict with the City's otherwise stated policies.  Indeed, the Mayor has touted the fact that his administration has significantly reduced fines assessed against small businesses, noting that "[s]mall businesses need support and resources – not onerous fines for violations that don't pose any risk to consumers," and that "[r]educing these fines is a bedrock of our effort to make it easier to open and operate a small business in New York City."  Blavin Decl., Ex. J at 1.

## III.    AIRBNB FACES IRREPARABLE HARM UNLESS THE ACT IS ENJOINED

For several reasons, Airbnb is likely to suffer irreparable harm absent an injunction.

*First*, Airbnb faces the threat of prosecution and significant penalties under a preempted law, which courts have recognized constitutes irreparable harm.  *See Metro. Taxicab Bd. v. City of New York*, 633 F. Supp. 2d 83, 88 (S.D.N.Y. 2009) (irreparable harm where plaintiff would be forced to comply with preempted law); *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) ("irreparable injury" under preempted law where plaintiffs face "Hobson's choice" of "expos[ing] themselves to potentially huge liability" or "suffer[ing] the injury of obeying" law); *Georgia Latino Alliance for Human Rights v. Governor of Ga.*, 691 F.3d 1250, 1269 (11th Cir. 2012) (irreparable harm exists where "Plaintiffs are under the threat of state prosecution for crimes that conflict with federal law").

*Second*, the loss of First Amendment freedoms "'unquestionably constitutes irreparable injury.'"  *Walsh*, 733 F.3d at 486.  Such harm to free speech is relevant both under the First Amendment and the CDA, which "sought to further First Amendment … interests on the Internet."  *Batzel*, 333 F.3d at 1028 (citing 141 Cong. Rec. H8469-72 (1995)).  Indeed,

"irreparable harm . . . exists" where, as here, there "is the potential for self-censorship," even in "the absence of hardship from imminent prosecution or threat of prosecution." *NYS Bar Ass'n v. Reno*, 999 F. Supp. 710, 715-16 (N.D.N.Y. 1998).

*Third*, the risk of criminal penalties, including possible jail time, also constitutes irreparable harm. *See Toomer v. Witsell*, 334 U.S. 385, 392 (1948) (irreparable harm where "defiance would have carried with it the risk of heavy fines and long imprisonment").

*Fourth*, the risk of fines reaching into the millions of dollars constitutes irreparable harm. The Act authorizes fines of up to $7,500 *per violation*, MDL § 121(2); N.Y.C. Admin. Code § 27-287.1(2), and the Attorney General's Office contends that 72 percent of the thousands of listings on Airbnb's platform in New York City advertise unlawful rentals.  Blavin Decl., Ex. K at 3. Courts have found irreparable harm based on potential fines of this magnitude. *See, e.g.*, *Satellite Television of N.Y. Assocs. v. Finneran*, 579 F. Supp. 1546, 1551 (S.D.N.Y. 1984) (irreparable harm where plaintiff "faced with a choice of" complying or "fine of $2,000 a day").

*Fifth*, the Act also gives rise to irreparable injury by being highly disruptive to Airbnb's operations and threatening a loss of consumer goodwill.  There are approximately 45,000 listings presently on Airbnb in New York, and listings are continuously being added to (and removed) from the site.  Owen Decl. ¶ 17.  For each listing, Airbnb likely would need to verify whether the listing advertises a lawful rental, but the Act does not provide any specific procedures for doing so.  Airbnb likely would need to create a dedicated team of employees devoted full time to verifying listings manually, and would need to re-design its website. *Id.* ¶¶ 16-19.  Implementing such procedures would take a significant period of time. *Id.* ¶ 19.

As such, and because the Act went into effect immediately upon being signed by the Governor, the only way Airbnb could avoid the law's substantial penalties would be to remove thousands of listings from its site.  This likely would include the removal of listings that may otherwise be lawful, as Airbnb will not be able to confirm the lawfulness of many listings on its site. *Id.* ¶¶ 17-20.  As a result, consumers may never return to Airbnb even if the law is ultimately overturned. *Id.* ¶ 21.  This disruption to Airbnb's business and resulting erosion of

consumer trust and goodwill constitutes irreparable harm.  *See Rex Medical L.P. v. Angiotech Pharm. (US), Inc.*, 754 F. Supp. 2d 616, 621 (S.D.N.Y. 2010) ("courts have found irreparable harm from a loss of goodwill or business relationships" where "dispute between the parties leaves one party unable to provide its product to its customers"); *Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 37-38 (2d Cir. 1995).

## IV.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR AIRBNB

The balance of equities tips decidedly in favor of Airbnb.  Airbnb faces deprivation of its constitutional rights, potential criminal and civil penalties and fines, and lost goodwill, which far outweigh any administrative harm the government might claim.  *See Mitchell v. Cuomo*, 748 F.2d 804, 807-08 (2d Cir. 1984).  The government can claim little harm to outweigh these significant injuries:  The Act went into effect on October 21, 2016, so there is no risk of disruption of established governmental practices.  *McKenna*, 881 F. Supp. 2d at 1286.  The public interest also strongly favors Airbnb.  The public interest generally is served by enjoining the enforcement of a preempted state law, *see Entergy Nuclear Vermont Yankee, LLC*, 733 F.3d at 422-23, and "'securing First Amendment rights is in the public interest,'" *Walsh*, 733 F.3d at 488.  It also is in the public interest to protect Airbnb from potential criminal liability and lost consumer goodwill resulting from unlawful regulation.  By contrast, an injunction would not prevent the government from enforcing its short-term rental laws against non-compliant hosts, leaving it with ample alternative means for addressing allegedly unlawful housing rentals.

## CONCLUSION

For these reasons, the Court should grant the application and issue the requested order.

DATED:  October 21, 2016

GIBSON, DUNN & CRUTCHER LLP

MYLAN L. DENERSTEIN
SARAH L. KUSHNER

By: _____
MYLAN L. DENERSTEIN

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-3850
(212) 351-6350 (fax)
mdenerstein@gibsondunn.com

MUNGER, TOLLES & OLSON LLP

JOHN W. SPIEGEL
JONATHAN H. BLAVIN
ELLEN M. RICHMOND
JOSHUA PATASHNIK

By:  JONATHAN H. BLAVIN

*Attorneys for Plaintiff Airbnb, Inc.*